SkeltoN, Judge,
concurring:
In my opinion, the penalty imposed upon the plaintiff was too severe. He had been a faithful employee of the Internal Revenue Service for over 21 years with an unblemished record. This, for all practical purposes, is a lifetime of useful service. There are many other circumstances in the case that are favorable to the plaintiff, all of which have been set forth and discussed by the trial commissioner and which will not be repeated here.
It must be conceded that plaintiff did violate the rules of the IRS, though he argues that at most the violations were mere technical ones. Nevertheless, the agency had the author *904 ity and discretion to determine and impose a penalty on the plaintiff and we are without power to substitute our judgment for that of the agency. There was no schedule of penalties for violations of the rules, and, under these circumstances, the disciplinary action taken was a discretionary one to be made by the agency. It appears that the prescribed rules, regulations, and procedures were complied with in effecting plaintiff’s removal. We cannot say that the action taken was not supported by substantial evidence nor that it was arbitrary, capricious, or so grossly erroneous as to imply bad faith. Neither can we say that the decision was so unduly harsh and unwarranted as to constitute an abuse of discretion by the agency that requires this court to hold the removal of the plaintiff to be unlawful and award him his back pay under the authority and reasoning of Clark v. United States, 162 Ct. Cl. 477, 484-5 (1963). In short, it appears that there is nothing we can do but allow the action of the agency and the administrative decision to stand undisturbed.
I realize that it is important, if not absolutely necessary, for the integrity and morality of Internal Revenue Service agents to be above reproach at all times. Their honesty and good character are taken for granted and must never be compromised. No doubt, the District Director felt that he was preserving these principles for the good of the service when he terminated plaintiff’s employment.
Nevertheless, in my opinion, the facts do not justify the extreme penalty of discharge from the service that was given to the plaintiff in this case. A lesser punishment could have been given and may have been contemplated in the beginning. In this connection, it will be noted that the District Director notified plaintiff by letter that “it was proposed to remove him from the Service or otherwise discipline him in order to promote the efficiency of the service.” [Emphasis supplied.][1] A severe reprimand, or a reduction in grade and salary, or a suspension for a period of time, or a combination of these, would have been adequate punishment for the plain *905 tiff and would have served tbe purposes of the Internal Revenue Service just as well as the disciplinary action which it took, and would have been much more reasonable and considerate under all of the circumstances of this case.
FINDINGS op Fact
1. On November 12,1963, plaintiff, a Grade 13 Supervisory Internal Revenue Agent employed in the Audit Division of the Internal Revenue Service at Brooklyn, New York, was, after the service of charges, removed from his position. Plaintiff’s appeal to the Civil Service Commission was unsuccessful and on November 17, 1965, he filed his petition herein alleging his removal to have been arbitrary, capricious, and unlawful. By order of May 2, 1966, the court denied both defendant’s motion and plaintiff’s cross-motion for summary judgment[1] and remanded the case to the trial commissioner for trial. Accordingly, a trial was, after pretrial proceedings, conducted.[2]
2. On October 29, 1962, two Internal Revenue Service Inspectors interviewed plaintiff to afford him an opportunity to answer questions concerning information which the Service had received relating to certain of his activities. Plaintiff was advised that he had a right to decline to answer any question which he felt might be incriminating and that any answer he gave could be used against him in any proceeding the government might institute. Plaintiff stated he had no objection to proceeding, with his statements to be made under oath.
Among the subjects discussed was a Chevrolet automobile which plaintiff had purchased in 1958, at which time plaintiff was a Group Supervisor in the Field Audit Branch of the *906 Audit Division (the same position he held in 1962). Plaintiff stated he had purchased the car from Kinney Motors, Inc., a dealer located in Brooklyn, New York.
Another subject discussed was an investment plaintiff had made in the Milbom Corporation, which was an investment syndicate consisting of twenty participants, as well as plaintiff’s relations with one Milton Bomback, a former Revenue Agent through whom plaintiff had made the investment and who was one of the principals of the corporation. Plaintiff denied he had ever had any “official dealings” with Bomback. (The verbatim record of the interview was signed and sworn to by plaintiff on November 21,1962.)
3. On January 17, 1963, plaintiff had another interview, under oath, with the same two Revenue Service Inspectors. Although the interview was considered as a continuation of the interview of October 29, 1962, plaintiff was given the same preliminary warnings. Plaintiff’s purchase of the 1958 Chevrolet was again discussed and the following facts were disclosed: Plaintiff had no bill of sale for the car. However, the purchase price was in part financed, and plaintiff did have a retail installment contract. Although plaintiff insisted he had purchased the car from Kinney Motors, such installment contract showed the seller to be the Roosevelt Chevrolet Corporation. Plaintiff stated that he had no explanation for this; that he had no interest in the manner in which the sale papers were made out; that he had no knowledge of any relationship that Kinney and Roosevelt might have had between themselves or why the sale papers had been prepared in such manner; and that he had made no inquiry about the matter at the time. Plaintiff stated that he had purchased the car from Kinney through a Mr. Peters of that firm; that he had first met Peters in 1951 when, as an agent, he had conducted a tax examination of Kinney Motors’ 1949 tax return, Peters then being Kinney’s bookkeeper and the one who had supplied plaintiff with the books and the other tax data plaintiff required; that when he visited Kinney Motors at the time he purchased the car, he had, instead of dealing with a salesman, specifically asked for Peters who he felt would give him “the best possible price he could”; that he had *907 made all payments on this purchase in cash; and that he had “probably” received “a better price” than “anybody else” would have received on a similar purchase of such a car “at that time.” He denied that his obtaining the car from Kinney was influenced in any way by (a) the fact that he, as an agent, had conducted Kinney’s tax examination in 1951; (b) that Kinney’s returns had been examined by agents in his group (with the results of the examinations approved by plaintiff) for the years 1951, 1952, 1953, and 1954, prior to his purchase of the car; and (c) that, at the time of the purchase, Kinney’s return for 1956 was in the process of being-examined by an agent in his group. The following answers were then given by plaintiff to the following questions:

By Mr. Sobin:

Q. Did you ever request that Kinney Motors not show the sale of the automobile to you ?
A. I might have indicated that I didn’t want to buy the car through Kinney Motors because of the possible misconstruing of my interest in them.

By Mr. Gorman:

Q. Why?
A. I thought inasmuch as . . . the only one I remember at that time who was doing an examination was Mr. Neuwirth, who had done it back in 1953. I don’t recollect that Mr. Orenstein had made the examination and as far as Seiff was concerned this was merely a carry-back so that didn’t mean anything.
Q. Now when you went in to purchase this car you did request Mr. Peters to handle the transaction in some manner so that it wouldn’t show that Kinney Motors sold you a vehicle. Is that it ?
A. I was reluctant about buying the car in the first place. He says well what difference does it make? This is what I would ordinarily sell it for at a good buy so there was nothing to be concerned about.
Q. Well why did you go to Kinney if you had reservations ?
A. We passed by Kinney Motors and stopped in to look at the cars and I was in the market for one.
Q. But you wanted to get one with certain conditions. Is that correct?
A. By conditions you mean what?
*908 Q. Well you did not want their books to show that the car was sold to you?
A. I was reluctant about buying the car there in the first place because of possible misconstruction.
Q. Well would you state then, that what was done, was to accommodate your request?
A. It might be possible.
Q. Well was it or wasn’t it?
A. Finally when he indicated that it was . . . because of the fact he ivas giving it to me at a good buy and that’s all, I didn’t care how he showed it, if he even showed it on his records as a sale from him. It didn’t make any difference.

By Mr. Sobin:

Q. But you did request that he not show your name ?
A. I indicated originally that I was reluctant about buying the car from him. He may have indicated that probably it doesn’t have to appear on the books. I don’t remember the situation at that time.

By Mr. Gorman:

Q. Do you think that’s how it happened ?
A. It may have happened in that fashion.
Q. And why was this discussion necessary? Was it because of your position ?
A. It was because I had remembered that Neuwirth had made the examination back in 1953, for the year 1953, I don’t know exactly when, and I thought probably there might have been some thought that I was getting ....
Q. Something for nothing?
A. Something for nothing.

By Mr. Sobin:

Q. When the retail installment contract was received by you and showed the name of Roosevelt Chevrolet what did you presume then?
A. I presumed then that probably this was the way it was done but it didn’t disturb me one way or the other. All I knew was I had to pay $80.81 a month for the next 24 months and that was the situation.
* * *
Q. You do admit, however, that the transfer of this vehicle to you was done in an unusual manner, partly to obscure your purchasing the car from Kinney Motors. Is that correct?
A. I assume that’s what it was.
*909 Q. And your reason for requesting this was because it might be construed, having had an official contact with Kinney Motors, could have been construed as maybe you were getting something for nothing?
A. Let me say that it was because of my reluctance to buy the car that it was done in this way, which I indicated before. I was reluctant to buy the car because it might have been, however remote, that there was some official relationship.
Q. It did not, in a final analysis, deter you ?
A. No.
(The verbatim record of this interview was signed and sworn to by plaintiff on February 28,1963.)
4. On February 28, 1963, plaintiff had a third interview, under oath, with the same two Kevenue Service Inspectors. This interview was considered as a continuation of the previous interviews, but the same preliminary warnings were again given. Plaintiff was desirous of modifying some answers he had given during the interview of January 17,1963, concerning an examination an agent in his group, a Mr. Neuwirth, had made of Kinney’s tax return prior to plaintiff’s purchase of the Chevrolet in 1958. At that time plaintiff had stated that during such examination by Neuwirth, plaintiff had not been in contact with Peters. The modification plaintiff desired to make was that, when Neuwirth was examining Kinney’s 1953 and 1954 tax returns, plaintiff, as a supervisor, had visited Kinney’s together with Neuwirth in 1955 and at that time did have contact with Peters in an official capacity, although plaintiff further stated that while it was Peters who handled the Kinney tax returns and the matters relating to Neuwirth’s audit, plaintiff merely “acted as an observer and made no recommendation or suggestions at the time.” Plaintiff also stated that, between 1951 and 1958, he had customarily had his cars serviced at Kinney’s and that on each such occasion he asked to see Peters instead of simply dealing with the service department. (The verbatim record of this interview was signed and sworn to by plaintiff on April 12,1963.)
5. (a) Under date of January 8,1963, Mr. Walter E. Hein-gartner, President of Kinney Motors, Inc., executed an affi *910 davit which stated, among other things, that Peters, who was Secretary-Treasurer of Kinney’s, had handled the sale of the 1958 Chevrolet to plaintiff; that on March 10, 1958, Kinney had sold the car to the Roosevelt Chevrolet Corporation, although the car physically remained at Kinney’s; that Hein-gartner had, prior to the sale, telephoned the President of Roosevelt Chevrolet and it was agreed between them that Roosevelt would purchase the car from Kinney and would then resell the car to plaintiff; that “the transaction although handled in an unusual manner was in no way intended to conceal the sale of an automobile to Mr. Kandall by Kinney Motors and was done only so that Mr. Barry [Roosevelt’s President, who had formerly been Kinney’s Secretary-Treasurer] could earn a reserve commission of between $40.00 and $50.00”; that “[t]o my knowledge Mr. Kandall paid a price comparable to the price paid by any other person making a retail purchase at that time. Also the trade-in allowance of $943.32 on Mr. Kandall’s 1955 Chevrolet was in line with automobile values at that time.”
(b) Under the same date, John Peters, Kinney’s Secretary-Treasurer, executed an affidavit which stated in part that he was Secretary-Treasurer of Kinney Motors and prepared its tax returns; that he had had no contact with plaintiff between 1951, when plaintiff had conducted a tax examination of Kinney’s 1949 and 1950 tax returns, and March 1958, when plaintiff purchased the new Chevrolet; that in connection with such purchase plaintiff had traded in a 1955 Chevrolet, upon which Kinney allowed $943.32; that plaintiff purchased the new 1958 Chevrolet “in the following manner”: Kinney had purchased the car from General Motors on February 10,1958, for $2,400; Kinney sold the vehicle to Roosevelt Chevrolet on March 10,1958, for $2,469; the car was never physically transferred to Roosevelt; Kimiey installed certain accessories, for which plaintiff paid $110; that, although Peters “handled the sale of the car to Mr. Kandall for Kinney Motors, it was sold to him by John Barry of Roosevelt Chevrolet,” and that “[t]his was done to enable John Barry to earn a reserve commission of $40.00 to $50.00”; that “[t]his transaction although handled in an *911 unusual manner was in no way intended to bide the sale of an automobile to Mr. Kandall by Kinney Motors”; and that plaintiff “paid a price comparable to the price paid by any other person making a retail purchase at that time, the trade-in allowance also having been in line.”
(c) Under date of April 4,1963, John J. Barry, President of Eoosevelt Chevrolet, executed an affidavit which stated, among other things, that in March 1958, Heingartner had, by a telephone call, asked “as a favor to him to arrange the GMAC financing of a car for one of his customers”; that he did not know the customer and had no contact with him; that he had, accordingly, executed a retail installment contract, dated March 11, 1958, showing Eoosevelt as the seller of the car and plaintiff as the purchaser; that Eoosevelt’s books showed the receipt of a check from GMAC for plaintiff’s account “in the amount of $1,599.75 plus a reserve commission of $35.10 which was received in connection with my handling of the GMAC financing”; that he had forwarded a check in such amount of $1,599.75 to Kinney “to cover the transaction” ; and that Eoosevelt’s records also contained an official New York State Bureau of Motor Vehicles form of Certificate of Sale showing that Eoosevelt had purchased the car from Kinney and had sold it to plaintiff; and that “[t]he vehicle was never in the possession of Eoosevelt Chevrolet and the above transaction was done by me as a favor to Walter Hein-gartner, whom I have known since his childhood.”[3]
6. By letter of September 12,1963, signed by the Brooklyn District Director of the Internal Eevenue Service, plaintiff was notified that it was proposed to remove him from the Service or otherwise discipline 'him in order to promote the efficiency of the service. The letter set forth the following reasons for the proposed action:
Charge I: Financial Transactions with Taxpayers or Their Eepresentatives with Whom You Had Official Connection, in Violation of Section 29, Eules of Conduct and Other Instructions for Employees of the Internal Eevenue Service, dated March 1952
*912 /Specification 1: As an Internal Revenue Agent, you audited the 1949 tax return of Kinney Motors, 2166 Coney Island Ave., Brooklyn, New York, closing the audit on July 9,1951. In addition, four Internal Revenue Agents under your immediate supervision audited the tax returns of Kinney Motors. Specifically, Henry Marlin audited the 1951 and 1952 returns, closing the audits on March 1, 1954; Jacob Neuwirth audited the 1953 and 1954 returns, closing the audits on July 6,1955; Hyman Orenstein audited the 1956 return, closing the audit on April 10, 1958 and John Seiff audited the 1959 return, closing the audit on January 25, 1961. In April 1958, you visited Mr. John Peters, Secretary-Treasurer of Kinney Motors who at that time was representing the firm in the audit of Kinney Motors conducted by Mr. Orenstein. It was your desire to buy a 1958 Chevrolet; however, as you stated in your affidavit of February 28, 1963 [4] you were hesitant in buying it from Kinney Motors due to your official connection with them. You, therefore, made an arrangement with Mr. Peters which would purport to show that you had purchased your car from another agency. Specifically, on April 10,1958 the records show that you purchased a 1958 Chevrolet Model 1847, Serial No. F58T-171341, from the Roosevelt Chevrolet Corp., 70-05 35th Avenue, Jackson Heights, New York. You had no contact with the Roosevelt Chevrolet Corp. whatsoever. In fact, you have admitted that you purchased the automobile from Kinney Motors. Mr. Peters of Kinney Motors accepted your 1955 Chevrolet in part-payment of this purchase.[5]
Charge II: As Group Supervisor Accepting for Assignment and Reviewing the Results of the Tax Examination of an Individual with Whom You had a Financial Association
Specification 1: In 1955 Mr. Milton J. Bomback formed the Milbom Corporation, of which he was President. This was a syndicate of approximately twenty individuals. In 1955, Mr. Bomback approached you in your office and you invested $5,000 in the Milbom Corp. On October 10,1956 *913 the Milbom Corp. was consolidated into a similar syndicate called the Jerilan Corp., of which Mr. Bomback was Vice President. In January 1956 Internal Revenue Agent Peter DeFeis, while under jour supervision, audited the 1954 income tax return of Florence and Milton J. Bom-back, and you reviewed and approved this audit. During this period, you had a financial interest in the Jerilan Corp.
Specification 8: On June 20, 1958 you closed by survey before assignment, the 1956 income tax return of Florence and Milton J. Bomback while you had a financial interest in the Jerilan Corp., as set forth in Specification 1 to this Charge.
7. In March 1952, the Bureau of Internal Revenue, United States Treasury Department, promulgated a handbook entitled “Rules of Conduct and Other Instructions for Employees of the Internal Revenue Service.” Plaintiff was then employed by the Service (having been so employed since 1935). He received a copy of such rules and was familiar with them. Section 29 thereof (also referred to as “Rule 29”), which was mentioned in the caption of Charge I in the notice of proposed adverse action, was as follows:
Financial Transactions. — Employees must avoid all business or financial transactions with taxpayers having cases pending before the Bureau or field offices with which such employees have an official connection. Every situation should be avoided which involves any financial consideration between an employee and such taxpayers or their representatives.
8. By letter of October 1, 1963, to the District Director, plaintiff replied to the charges and specifications contained in the District Director’s letter of September 12, 1963. As to Charge I, Specification 1, plaintiff stated:
As a field agent, I audited in 1951 the 1949 tax return of Kinney Motors Inc. My report was reviewed and approved by my superiors through customary and procedural channels. About March of 1955 I purchased a new Chevrolet. About March 1958, my wife and I decided to trade our old Chevrolet for a new one. I inclined towards Kinney. I had discontinued using the dealer from whom I had purchased the 1955 Chevrolet since their servicing was poor. On several occasions I had used Kin *914 ney’s service and found it satisfactory. I went to Kinney and talked with Mr. Peters. I recalled to him that some years 'back I had audited a Kinney return and that I had some hesitancy in making the purchase. He remarked in substance that he could, not see any reason why Kinney should suffer.
“I was reluctant about buying a car in the first place. He (Mr. Peters) said, well what difference does that make ? That is what I ordinarily would sell it for a good buy so there was nothing to be concerned about. (Page 81, Interview January 17, 1963.)”
A sale was concluded by a down payment of $120.13 plus my old car and a Gr.M.A.0. loan. During the interview of January 17, 1963, when asked where and from whom I purchased the car, I answered from Kinney Motors. I did not attempt to conceal the fact that my dealings were with Kinney. I made no request or suggestion that the Kinney Company name be submerged. To this date I am not aware of the relationship between Kinney and Roosevelt Chevrolet through which company Kinney cleared the sale. My down payment was made to Kinney Motors.
Concerning the agents who audited the Kinney returns in subsequent years, I did not control the assignments of such returns to my group or to specific agents, since they came down through the Control Section, over which I obviously and clearly had no control. It is a coincidence which happens occasionally with the same taxpayer, considering the large number of returns filed in the Brooklyn office. I state herein, that at no time have I ever exercised any influence over agents in my group, or directed them, in any devious or self serving maimer, or in any manner that would or could inure to my personal gain or benefit. I respected them and they respected me with reliance that the best interests of the Internal Revenue Service would be foremost in the performance of our duties without favor or prejudice to anyone.
Further may I point out that practically every automobile agency in this district, at one time or another has or has had one or more years under audit; under an extreme interpretation of Section 29, anybody in a supervisory position in this district would be precluded from transacting business as they could be considered to “have official connection” with such firms. It appears that Sec *915 tion 29 fails to explain or define where “official connection” begins or ends.
As to Charge II, plaintiff stated:

iSpecification 1:

Mr. Milton Bomback left the service in the early fifties and subsequently entered the brokerage business. He formed Syndicates, each comprising about 20 individuals who would contribute to a fund used to buy and sell securities. He urged I join one of these syndicates. I was not interested. He kept after me, always impressing upon me that his syndicates were very successful; that many had doubled and tripled in value. He eventually convinced me, in 1955, to invest in Milboin Corporation, which in October 1956 consolidated with the Jerilan Corp., thereby increasing the number of participants. Unfortunately, the investment was a poor one from the beginning.
May I emphasize that these syndicates were open to anybody and that no special or favored treatment was accorded to me.
Agent Peter DeFeis’ examination in 1956 of the personal return of Mr. & Mrs. Bomback was for 1954. He performed a thorough audit. I saw no wrong in approving his report.

Specification®:

This specification must be viewed in the light of actual office procedure prevalent in 1958. Before the end of each fiscal year (usually in June) our office was desirous of eliminating prior years from our unassigned control files (audit service) in order to make room for more current returns. All these returns were selected returns which would in the normal course have been audited if we had sufficient manpower.
A mass survey before assignment would then be made involving as many as several thousand returns. Each group would be given a few hundred returns and asked to eliminate by survey the major portion of them, retaining only those with high tax potential.
Each group supervisor would assign some of his senior agents for the purpose of assisting in this survey. Though the survey may in fact have been made by a senior agent — the supervisor alone initialed the return. I have no recollection of having myself made the survey. There would appear to be no question, however, that the survey *916 was made in my group since the approving initials apparently are mine. * * *
9. On October 17, 1963, plaintiff (apparently pursuant to bis request) was given tbe opportunity of making an “oral reply” to the Chief of the Brooklyn District’s Administrative Division, who was appointed by the District Director to hear such reply and accept any additional information or evidence plaintiff wished to submit.
As to the matter of the purchase of the automobile in 1958, plaintiff stated, among other things:
* * * the fact that I observed to him [Peters] that I had some misgivings with respect to my purchase of the car because I did have this examination that I made seven years previously, indicates that I observed the rules of conduct militantly. * * * Even by the remotest possibility if it was in the back of my mind that the fact that I had made an examination previously, there was some misgivings because I am so sincere about it, and so conscientious I don’t think that I should 'be penalized. I think it indicates good faith the fact that I even had it in the back of my mind.
Pie admitted that, at the time he purchased the car, Kinney Motors’ income tax return was being examined by an agent in his group, but denied that he was then aware of such situation. As proof he sought no favors from Kinney, he pointed to the fact that he had not purchased his 1955 Chevrolet from Kinney despite his 1951 audit of Kinney’s return and the subsequent audits of Kinney’s returns in his group. He further stated that he had purchased the 1958 car from Kinney because of his satisfaction with its servicing of his previous car, his respect for it as an outstanding firm, and his belief that he would be treated fairly; that “the only explanation” he could give as to how Koosevelt Chevrolet entered the picture was
* * * the fact that because I indicated that I did have some misgivings with respect to purchasing the car from Kinney because of my audit. * * * He [Peters] probably, to allay my sensitivity might have handled the paper through some other company * * *, not that I had any desire, as far as I was concerned, as long as I satisfied myself that my sensitivity was a little far-fetched. *917 I liad no more, no question about it, I did not care bow be bandied it. Tbis was up to bim as far as I’m concerned, because if it was a matter of my wanting to bide it in any way, tbis is no way, this is absolutely to no purpose. It would have been my suggestion, I imagine, if I so desired, for him to send me to another Chevrolet dealer and have the entire transaction come from the other Chevrolet dealer. That’s the only way I could possibly figure anybody would make the transaction that they wanted to hide, but in this particular case I hid nothing.
He further stated that he was not concerned with the fact that, although he felt he was purchasing the car from Kinney, the papers showed the sale was made by Koosevelt; that, despite his apprehension about the purchase, he did not believe it was necessary to check with his superiors, since he felt reassured by Kinney’s having “pooh poohed” his “misgivings * * * because it was being a little too sensitive with respect to a transaction that occurred seven years previously” ; that the audits of the Kinney returns made by his group subsequent to 1951 and prior to the 1958 purchase of the car were performed pursuant to assignments of “cases” [6] made by the District’s Control Section, and not by plaintiff, and that he had exercised no control over any of the audits made by the agents in his group; that the theory that a supervisor could not purchase a car from a dealer whose return had been audited in his group could be carried “to a ridiculous degree” since it would mean that the District Director could not purchase a car from any dealer located in the Brooklyn District; and that, on the same basis, since the return of the Brooklyn Union Gas Company was being-audited in his group, the contention could be made that his purchasing gas from such company for his home (which he was doing) resulted in a conflict of interest.
As to Specification 1 of Charge II, plaintiff stated that the “financial association” he had with Bomback consisted only of his investing in the syndicate in 1955, and that “[t]his was a situation where I did something for him by investing in *918 this particular club to enable him to earn commissions,” since Bomback had recently gone mto the brokerage business, and his employment of the syndicate funds to buy and sell securities would enable him to earn such commissions; that he did not “consider this any more than my having purchased a mutual fund”; that this relationship with Bom-back did not result in his being indebted to Bomback for anything and which would cause him, by approving reports of examinations of Bomback’s returns, or otherwise surveying such returns, to give Bomback any benefit; that the particular agent who, in 1956, audited the 1954 return of Bomback (and his wife) did not even know at the time that plaintiff knew Bomback; that such agent “does a very fine job” and “makes an extremely thorough audit” and that “I think I would be remiss if I took this particular report and gave it to another group supervisor to approve.”
As to Specification 2 of such charge, plaintiff stated that the procedure whereby he closed by “survey before assignment” the 1956 income tax return of Bomback (and his wife), was as follows: The Audit Division, in an attempt to reduce the backlog of unexamined returns at the close of a fiscal year, forwarded to each group supervisor several hundred returns that had been previously selected for audit. Each supervisor was then responsible for eliminating around fifty to seventy percent of the returns from the audit requirement. The supervisor distributed some returns to certain 'agents in his group. The supervisor and such agents would then, by a general survey, determine which returns indicated the least potential for tax deficiencies. He further stated, however, that the supervisor was ultimately responsible for the selection of those returns which were closed by this “survey before assignment” procedure since he was required to initial each return so closed; that Bomback’s 1956 return happened to be included in the batch of returns that was sent to his group and was so surveyed out; that when he initialed the return for such elimination, he had no misgivings that his action might be misconstrued since he did not feel that he had had any kind of financial arrangement or transaction with Bom- *919 back which, might motivate him to benefit Bomback in any way.
At the time plaintiff made this “oral reply,” he had had 2814 years of service with the Internal Bevenue Service (or its predecessors in the Treasury Department). He had entered the Service on May 1,1935, as a Grade 7 Field Auditor. He was promoted to Group Supervisor in 1953.
10. By letter of November 7, 1963, the District Director advised plaintiff that “[a]fter careful consideration” of the charges against him, and of his written and oral replies, “it has been decided that charge I and specification 1 thereto, and charge II and specifications 1 and 2 thereto, which are supported by substantial evidence are sustained and warrant your removal.” The letter further stated in part:
Your statements in refutation of charge I, specification 1 are not supported by credible evidence and do not overcome the substantial evidence supporting the specification. Begarding charge II, specification 1 and 2 you attempt to mitigate them by saying your actions in these instances were cursory. However, the charge and specifications are not refuted and the seriousness of your neglect cannot be condoned.
The letter advised that plaintiff would be removed from the Service effective November 12,1963, “in order to promote the efficiency of the Service.”
11. Plaintiff was removed from his position effective November 12, 1963. At that time his salary was $13,340 per annum.
12. On November 15, 1963, plaintiff, by his attorney, appealed his dismissal to the Civil Service Commission.
13. By letter of November 18,1963, an Appeals Examiner of the Civil Service Commission’s New York Begion notified the Internal Bevenue Service of the appeal and requested certain data, including “[t]he evidence relied upon to support the charges or reasons for the adverse action appealed.” In response, the Service sent a number of documents, including the following: (a) plaintiff’s “affidavits” referred to in findings 2, 3, and 4; the Heingartner, Barry, and Peters affidavits, referred to in finding 5; a “Certificate of Sale” dated *920 March 10, 1958, showing the sale of the 1958 Chevrolet by Kinney Motors to Roosevelt Chevrolet; and forms showing the action plaintiff had taken with respect to the Kinney Motors and Bomback tax returns previously mentioned.
14. (a) On December 24, 1963, plaintiff submitted an affidavit in support of his appeal in which he stated, in part, that he had not received any favors or preferential treatment and that “[t]he mere fact that a taxpayer’s business is under audit does not necessarily preclude an Internal Revenue employee from patronizing said taxpayer”; that “Section 29 is too general, indefinite and too vague”; that even assuming he was “guilty of an error in judgment,” it was merely a “technical breach of the rules without wrongful 'intent” which was “not sufficient to warrant the discharge of an employee with a record of faithful service”; and that “[t]he penalty of dismissal was too drastic and too severe.” He requested that affidavits be obtained from Agent DeFeis concerning his audit of the Bombacks’ 1954 tax return and that affidavits be obtained from Field Audit Branch Chief Salvatore J. Carruba and George D. MacDonald, Assistant Chief of the Audit Division, concerning the “survey before assignment” procedure.
(b) The affidavits plaintiff requested be procured were obtained, as follows:
(1) MacDonald, by affidavit of January 15, 1964, stated that “the responsibility for such survey was each group supervisor’s alone”; that plaintiff’s initials on the Bomback return indicated “that he had surveyed that return,” and that “there was no review of” plaintiff’s “decision to close by survey before assignment.”
(2) DeFeis, by affidavit of January 15,1964, stated that the 1954 Bomback return was assigned to him for audit by plaintiff on January 3,1956, and that his report was reviewed and approved by plaintiff; that at no time had plaintiff attempted to influence him in connection with such audit (or any other audit); that his audit resulted in “some slight adjustment in expenses, which resulted in some additional tax liability of a minor nature”; that there were no changes made in his audit; *921 and that at that time he did not know that plaintiff knew Bomback.
(3) Carruba, by affidavit of January 15,1964, stated that in 1958 “the practice of closing by survey before assignment may have entailed the review by each Group Supervisor of anywhere from 25 to 200 returns” (being an estimate based upon his then recollection); that over the years, he had had Senior Agents in his group assist him in reviewing returns for “possible closing by survey before assignment” and that after such preliminary review by such agents, he would review “those recommended for closing by survey and then place my initials on the face of the return”; that “[a] 11 Group Supervisors knew it was our responsibility” and that “[tjhere was no automatic review of our action of closing by survey before assignment.”
15. (a) By affidavit of February 5, 1964, which was submitted to the Civil Service Commission, the Brooklyn District Director stated that plaintiff “knew that he had had close official connection with Kinney Motors” and that plaintiff “did not wish to have the sale of the Chevrolet recorded as having been purchased from” Kinney; that “[t]here is no doubt that Mr. Kandall was aware of the subterfuge used as is evidenced by the retail installment contract with Boosevelt Chevrolet Corporation which Mr. Kandall signed on March 11, 1958” (a copy of which was attached to the affidavit) ; that “the fact that Mr. Kandall received a benefit through this arrangement is shown on page 79 of his affidavit of April 12,1963, in which he was asked if he thought he got a car at the same price that anybody else would have paid for it at that time,” and he answered that “ ‘probably I got a better price’ ”; that at the very time of the purchase “Mr. Hy-man Orenstein, an agent under his supervision, was currently examining the 1956 tax return of Kinney Motors”; that, as to his relationship with Bomback, “[k]nowing him personally as a former Internal Revenue Agent and through this investment syndicate .[Milbom Corporation], it was incumbent upon Mr. Kandall to disqualify himself from the review of the results of the tax examination of Mr. Bomback”; that the facts set forth in DeFeis’ affidavit “in no way relieves *922 Mr. Kandall of the responsibility of disassociating himself completely from any official connection with Mr. Bomback,” and that “[h]is initials on the agent’s report constitute approval of that report”; that, as to the closing by survey before assignment, plaintiff “should have been fully cognizant of the seriousness of” such a closing and that “ [d] ue to his association with Mr. Bomback he should have immediately referred the return to his superior”; that plaintiff’s “[djefending his action by stating that he signed an important document without noticing the name on the document is a sad commentary on Mr. Kandall’s views of his responsibilities as a supervisor”; and that “[t]he Internal Revenue Service does not use a standard code of penalties.”
(b) The copy of the retail installment contract, dated March 11, 1958, attached to the affidavit, showed plaintiff as the buyer of the car and Roosevelt Chevrolet Corporation as the seller.
16. By an affidavit of February 21,1964-, Peters stated that he saw no reason why his firm should lose a customer simply because it had “some official dealings with an agency where the customer was employed”; that the car plaintiff had traded in and upon which Kinney had allowed plaintiff $749.12 had been resold for $1,275, which, after reconditioning costs, had resulted in a net profit of $303.04 to Kinney; and that plaintiff had not received any better deal than anyone else would have received.
17. On February 25, 1964, a hearing was held before an Appeals Examiner of the New York Region of the Civil Service Commission. Plaintiff was represented by counsel and was the only witness.
At the beginning of the hearing, plaintiff’s counsel objected to the interrogation of plaintiff at the three interviews with the Revenue Service Inspectors (findings 2,3,4), which he referred to as a “pre-trial investigation,” and urged that anything plaintiff said during such interviews should “be stricken from the record and should be disregarded upon the ground that his rights were violated.” He contended that “the right to counsel extends to pre-trial proceedings as well as to the hearing itself * * *.” He contended that the procedure *923 whereby, in the absence of any charges and without any prior notice, plaintiff was directed to appear at the Regional Office and was, without being advised of his right to counsel or to representation, interrogated, was illegal.
With respect to the purchase of the car in March 1958 [7] plaintiff testified that, while he was looking at cars in Kinney’s in March 1958, he “had a sudden hesitancy about buying the car from Kinney Motors due to the fact that I had examined them seven years previous and I must have indicated that to them, but it had no effect. I mean I resolved in my own mind that this was being a little bit squeamish and we [he and his wife] finally decided that we would buy the ear there at Kinney’s”; that he knew nothing of any relationship between Kinney Motors and Koosevelt Chevrolet, nor did he have any concern about the conditional bill of sale showing Koosevelt as the seller; that he did not know or remember at the time that Kinney was being audited by one of the approximately twelve agents in his group, although the records did show his initialed assignment of the Kinney return to an agent in his group in January 1958; that the use of Koosevelt was not as a subterfuge so that he could obtain any special consideration; and that all he was concerned about was the purchase of a car at a reasonable price, monthly payments he could carry, and good service.
As to Charge II, Specification 1, plaintiff admitted that in 1955 he made, upon the solicitation of Bomback, a former agent whom he knew, and who was then in the brokerage business, an investment in the Milbom Corporation, a syndicate of twenty individuals, in which Bomback was also a principal (which was later merged into the Jerilan Corporation), the purpose of the syndicate being to buy and sell securities; that of the $5,000 which he had put into Milbom, $2,000 was as an investment and $3,000 was as a loan to the corporation, which loan was repaid in two to three months; that he knew Bomback was, for a fee, managing the syndicate and that his brokerage firm would realize commissions on the purchase and sale of the Milbom securities; and that in 1956 *924 Agent DeFeis, who was in his group, audited the Bombacks’ 1954 income tax return pursuant to an assignment made by plaintiff, and that plaintiff had reviewed and approved the audit.
As to Charge II, Specification 2, plaintiff testified that the unassigned returns, previously selected for audit, which were sent to him by the Control Section were in turn given to certain key men in his group who, by a survey, would select (on the basis of the least tax potential) those which would be eliminated from audit requirement, and that all that remained for him to do was to stamp such returns “surveyed before assignment,” initial them, and return them to Control; that, although he alone was authorized to stamp and initial for his group, he relied upon the judgment of his men as to which returns would be selected for elimination; that, if time permitted, he would take a certain portion of the returns himself for survey; that he disagreed with the procedure described in the Carruba affidavit (finding 14(b)), concerning the Group Supervisor’s going over the selected returns himself, because it resulted in the same work being-done twice, and that he himself simply relied on the judgment of the agents in his group as to their selections; that he recalled the number of returns sent to his group as between 400 and 600, and not 25 to 200 as stated by Carruba, and that it was not possible for the Supervisor himself to review all of such a large number of returns; that he also disagreed with the MacDonald affidavit (finding 14(b)) concerning the Group Supervisor’s responsibility and that MacDonald himself told plaintiff to delegate the survey duty to his key men; and that he saw nothing improper in the Bombacks’ 1956 return being closed by survey before assignment and that he had no interest at all in Bomback.
18. By decision of March 17, 1964, the Civil Service Commission’s Appeals Examiner (and the Regional Director), concluding that the Internal Revenue Service had complied with all procedural requirements, that the agency’s charges were supported by the evidence, and that the action taken to remove plaintiff was reasonable and for such cause as would promote the efficiency of the service, sustained the removal action.
*925 As to Charge I, reliance was placed upon plaintiff’s statements during his interviews with the Service Inspectors (findings 2,3,4), especially the interview of January 17,1963, and the portions thereof quoted in finding 3. The Heingartner, Peters, and Barry affidavits, set forth in finding 5, were reviewed, as well as other exhibits showing that the 1956 tax return of Kinney Motors was assigned by plaintiff to an agent in his group on January 2, 1958, the audit being closed on April 29, 1958. Plaintiff’s written (finding 8) and oral (finding 9) replies were also reviewed, as well as his testimony at the Commission hearing (finding 17). The decision rejected plaintiff’s statement that he was not aware that an employee of his group was reviewing Kinney’s 1956 return when he bought the car in March 1958. It also found that when he approved the employee’s report concerning the Kinney audit in April 1958 plaintiff “knew that he had just a month before purchased a car from Kinney Motors.” The Examiner further found that
* * * the evidence discloses that because of appellant’s doubts as to the propriety of his entering into a business transaction with Kinney Motors, the sale of the car was accomplished through Roosevelt Chevrolet Corporation. There is no doubt that this unusual transaction was carried out in this way so as not to disclose on the record that the appellant purchased the car from Kinney Motors. This subterfuge was initiated by appellant’s questioning the propriety of his dealings with Kinney Motors and was acquiesced in by him when he signed the retail installment contract with the Roosevelt Chevrolet Corporation.
The decision noted “a serious discrepancy” between the Hein-gartner and Peters affidavits on the one hand and the Barry affidavit on the other in that the former stated the sale was accomplished through Roosevelt as a favor to Barry, but with Barry stating he was requested to arrange the sale in such manner as a favor to Kinney Motors.
It was accordingly concluded that plaintiff “had engaged in a financial transaction with a taxpayer, Kinney Motors, with whom he 'had an official connection, in violation of Section 29 of the Rules of Conduct.” Plaintiff’s contention that Sec *926 tion 29 “is too vague and indefinite” was rejected, it being concluded that, although the “Rule is necessarily general in nature * * * [ajppellant’s conduct indicates that he was well aware of the Rule and its application” which was “borne out by the manner in which the sale of the car was accomplished.” On this charge, the decision concluded:
* * * Appellant’s claim that Section 29 would be reduced to absurdity were it contended that because of an audit, employees of Internal Revenue Service would be prohibited from patronizing the taxpayer is not convincing. The facts of this case disclose a close, personal business relationship between the appellant and the taxpayer with whom the appellant had official business, and it is this close, personal relationship which brings his activities directly within the Rule.
As to Charge II, the decision also reviewed plaintiff’s statements to the Inspectors concerning the $2,000 investment in, and the $3,000 loan to, the Milbom Corporation, and the consolidation of Milbom and Jerilan, of which Bomback was Vice President, the loan having been repaid but the investment being maintained throughout. The exhibits showing that, on January 3, 1956, plaintiff 'had assigned for audit to Agent DeFeis the Bombacks’ 1954 return and had approved the agent’s report, and that the Bombacks’ return 'had been closed by survey before assignment on June 20, 1958, with the form stamp and plaintiff’s initials appearing on the return, were also reviewed. The decision also reviewed plaintiff’s written and oral replies, as well as his testimony at the hearing. It rejected plaintiff’s contention “that his investment in Milbom was no different than in a mutual fund” since plaintiff was “sought out by Bomback” and in view of plaintiff’s “loan to the Milbom Corporation of $3,000 and the limited number of investors in the Corporation (20).” It noted that Bomback “promoted” both Milbom and Jerilan, “and held high office in each, namely President and Vice President, respectively.” It concluded that as long as Bom-back and plaintiff “maintained their relative connection with the corporations, their financial association instituted in 1955 continued.” On this charge, the decision concluded:
*927 * * * We cannot accept appellant’s contention that there was no conflict of interest in that the tax returns in question were those of Bomback and not of the corporations, Milbom and Jerilan, in which he had a financial interest. We are of the opinion that the financial association between Bomback and appellant, begun in 1955, was not severed by the corporate veil as long as Bomback continued to promote the corporations and hold high office in them. It is our opinion that at the time appellant approved the audit of Bomback’s 1954 tax return and surveyed before assignment Bomback’s 1956 return, he had a financial association with Bomback and should have disqualified himself from the review of these returns. In the light of the foregoing, we find Charge II and its supporting specifications, I and II, are sustained by the preponderance of the evidence.
As to plaintiff’s contention concerning the alleged illegality of the three interviews he had with the Internal Eevenue Service Inspectors, it was noted that plaintiff had been advised of his constitutional right to decline to answer any incriminating question and that he had raised no objection to proceeding with the interviews. It stated:
* * * A proceeding of this kind is not criminal or quasi-criminal but administrative in nature and any attempt by the appellant to relate it to pre-trial interrogation and investigation is improper. Appellant, as an employee of the agency, is required to and has the duty to cooperate with his superiors and fellow workers in their conduct of official business.
Finally, the decision rejected plaintiff’s contention that, if there was a violation of the Bules of Conduct, it amounted only to a technical breach without wrongful intent, that there was no showing he had received any benefit or monetary gain from any such breach, and that, under the circumstances, the penalty of removal was too harsh. Plaintiff’s statement to the Inspectors that he “probably got a better price” from Kinney on the automobile than anyone else would have received (finding 3) was noted in connection with his contention that he received no benefit or monetary gain from any of the matters contained in the charges. However, the decision went on to state that even had plaintiff received no monetary benefit, it would be immaterial.
*928 * * * Further, we must consider the nature of the work in which appellant was engaged. We believe that employees of the Internal Revenue Service must be held to strict accountability under the agency’s standards of conduct because of the nature of the work performed. To allow employees of the Internal Revenue Service to compromise their integrity or morality in any way could lead to serious consequences and a breakdown in our tax collection structure. For this reason, a breach of Section 29 of the Rules of Conduct even without any evidence of gain cannot be considered minor or technical. Appellant’s 28 years of service should have underlined the importance of adhering strictly to the rules and if in doubt, resolve that doubt in favor of the agency. Instead, as the evidence indicates, he resolved all doubt in his favor without any attempt to seek the aid of his superiors or fellow workers.
The conclusion was that the “evidence fully supports” the charges “and that the action of removal, based upon the sustained charges and specifications was not arbitrary or capricious and was not procedurally defective.”
19» Plaintiff appealed from the adverse decision of the Civil Service Commission’s New York Regional Office to the Commission’s Board of Appeals and Review. In said appeal he contended (1) that Ms rights were procedurally violated in that, in his three interviews with the Inspectors of the Revenue Service, he had not been “advised of his right to retain counsel, or to be represented”; (2) that the Internal Revenue Service had failed, by substantial evidence, to sustain its burden of proof that plaintiff was guilty of the charges; (8) the removal notice was defective because it failed specifically to indicate in what respect the dismissal would promote the efficiency of the service; and (4) the penalty of dismissal was unduly harsh.
20. By letter of October 22, 1964, the Civil Service Commission’s Board of Appeals and Review affirmed the decision of the New York Regional Office. It reviewed each of the four points of plaintiff’s appeal (finding 19). As to plaintiff’s first point, the Board
* * * noted that Mr. Kandall made no objection to proceeding with the interview after he had been advised of his Constitutional right to decline to answer any *929 incriminating question. Further, the regulations of the Civil Service Commission and the agency prescribe the conditions under which employees may be represented by counsel or other person after charges ham been made; they contain no provision for right of counsel in employee-supervisory discussion prior to notice of disciplinary action or adversary proceeding. (Erenreich v. U.S. Ct. Cls. #34-62, January 24, 1964.) Accordingly, the Board finds no procedural violation as alleged.
As to plaintiff’s second point, the Board stated that it had reviewed the evidence, that it concurred in the Begional Office’s analysis and evaluation of the pertinent documents “as well as Mr. Kandall’s admissions,” and that it concluded “that a preponderance of the evidence fully supports” the charges and specifications thereof involved.
As to the third point, the Board reviewed the agency’s notice of decision, dated November 7, 1963 (finding 10), and concluded that the agency officials had therein “specifically identified the reasons upon which they relied to effect the action” and which supported their conclusion that plaintiff was being removed “to promote the efficiency of the service.”
As to the fourth point (i.e., that the penalty of dismissal was unduly harsh and severe), it concurred in the Regional Office’s finding “that because of the very nature of their positions employees of the Internal Revenue Service must be held to strict accountability under the agency’s standards of conduct.”
21. At the trial herein, plaintiff was the only witness. In all material respects his testimony was substantially similar to the testimony he gave before the Appeals Examiner of the New York Region of the Civil Service Commission (finding 17).
Ultimate FINDINGS AND CONCLUSIONS
22. No procedural defect in effecting plaintiff’s removal is now claimed or is apparent.[8] Plaintiff duly received a notice *930 of proposed removal advising of the offenses charged (finding 6); he replied to the charges, both verbally and in writing (findings 8, 9); and, after consideration, the District Director notified plaintiff of the charges and specifications that he concluded were sustained and stated that plaintiff would be removed on a specified date to promote the efficiency of the service (finding 10). Thereafter plaintiff appealed to the Civil Service Commission. He was granted a hearing before the New York Regional Office at which he testified and evidence was received. From that office’s adverse decision, supported by a considered opinion analyzing the evidence in detail (finding 17), plaintiff appealed to the Commission’s Board of Appeals and Review, from which he again received a decision which discussed every point he raised on his appeal (finding 20).
In such a case, it is well settled that, where there is no showing that the employee’s removal was not in accordance with the procedures required by the pertinent statutes or regulations, “* * * this court will not review the action of the agency to determine whether there was just cause for removal.” Liotta v. United States, 174 Ct. Cl. 91, 95 (1966). “* * * the determination of whether to separate an employee for the efficiency of the service is within the peculiar competence of the employing agency.” Indiviglio v. United States, 156 Ct. Cl. 241, 246, cert. denied, 371 U.S. 913 (1962). As the court further held in Liotta, which also involved a discharge of an employee of the Internal Revenue Service: “It is only if the action of the District Director was shown to be arbitrary, capricious or so grossly erroneous as to imply bad faith that plaintiff’s removal could be upset.” 174 Ct. Cl. at 95. Accord, Guiness v. United States, 149 Ct. Cl 1,[9] cert. denied, 363 U.S. 819 (1960); Morelli v. United States, 177 Ct. *931 Cl. 848 (1966);[10] Holman v. United States, 181 Ct. Cl. 1, 383 F. 2d 411 (1967);[11] and cases cited therein.
23. (a) On the basis of the principles above set forth, it is plain that “plaintiff has failed to carry the heavy burden cast upon him” (Greenway v. United States, 175 Ct. Cl. 350, 353, cert. denied, 385 U.S. 881 (1966)) of showing that his discharge by the Internal Revenue Service was in any way arbitrary or capricious.
(b) As to plaintiff’s purchase of the automobile in 1958 from Kinney Motors, it is plain that the District Director could, on the basis of (1) the facts admitted and the statements made by plaintiff at the three interviews with the Revenue Inspectors (findings 2, 3, 4); (2) the Heingartner, Peters, and Barry affidavits (and the conflicting statements therein) (finding 5); (3) the admissions and statements made in plaintiff’s written and oral replies (findings 8, 9); and (4) the documents involved pertaining to the sale and the Kinney audits over the years made by plaintiff or agents in his group, reasonably conclude that the charge that plaintiff had, in violation of Rule 29 (finding 7), a “financial transaction” with taxpayer Kinney at the time he had “an official connection” with such taxpayer, was sustained. All such evidence, and especially the sworn admissions made by plaintiff in his interview with the Revenue Inspectors on January 17, 1963 (finding 3), was a sufficient basis for the District Director to conclude that (1) plaintiff knew he was in all probability violating Rule 29; (2) plaintiff did not wish to have the sale recorded as having been made by Kinney; (3) he “was aware of the subterfuge” indulged in of having the *932 retail installment contract made ont in Roosevelt Clievrolet’s name; (4) be felt he was receiving preferred treatment on the transaction (finding 15 (a)); and (5) such a violation of Rule 29 warranted plaintiff’s dismissal “to promote the efficiency of the sendee.”
(c) As to the charge based on plaintiff’s reviewing and approving the audit of the 1954 Milton Bomback income tax return in 1956, as well as plaintiff’s action in 1958 of closing by survey before assignment Bomback’s 1956 return, plaintiff’s proof fails to demonstrate that it was unreasonable for the District Director to conclude that plaintiff took such action while he had a “financial association” with Bomback, i.e., plaintiff’s investment in small investment syndicates (the Milbom Corporation which was later consolidated into the Jerilan Corporation) in which Bomback was a principal (President of Milbom and Vice-President of Jerilan, and with Bomback’s brokerage firm doing the buying and selling, on commission, of the securities in which the corporations invested). As is shown by plaintiff’s written reply to the charges (finding 8), there was really no dispute concerning the essential facts relating to this charge and the two specifications thereunder.
24. Similarly, where an employee has “pursued an appeal through the Civil Service Commission which upheld the action of the agency,” the Commission’s decision “is final and conclusive unless arbitrary or otherwise unlawful. Blackmon v. United States, 128 Ct. Cl. 288, 120 F. Supp. 774 (1954);[12] Hoppe v. United States, 136 Ct. Cl. 559 (1956), cert. denied, 355 U.S. 816 (1957); Eclov v. United States, 137 Ct. Cl. 341, 343 (1957).” Liotta v. United States, supra, 174 Ct. Cl. at 96.
*933 On the basis of the evidence that was before the District Director, as above set forth, as well as the additional proceedings before the Commission (findings 13 — 20), including a full hearing before an Appeals Examiner, at which plaintiff testified (finding 17), it is plain that neither the careful, analytical decision of the New York Regional Office (finding 18), making findings adverse to plaintiff, nor the decision of the Commission’s Board of Appeals and Review (finding-20) , concluding “that a preponderance of the evidence fully supports” the charges, can be characterized as arbitrary or capricious.
25. (a) The contention that if plaintiff’s conduct was wrongful, his action amounted only to a technical breach of the rules not warranting the harsh penalty of dismissal, cannot be accepted. The Internal Revenue Service did not employ any standard code of penalties (finding 15(a)) under which, for instance, the penalty of discharge for the offenses herein involved would not be appropriate. Cf. Cohen v. United States, 177 Ct. Cl. 599, 619-20, 369 F. 2d 976, 988-89 (1966), cert. denied, 387 U.S. 917 (1967). Accordingly, “* * * absent the violation of any agency regulation fixing appropriate corrective measures for various offenses (Daub v. United States, 154 Ct. Cl. 434, 292 F. 2d 895 (1961)), the disciplinary action to be taken is a discretionary matter for the agency itself.” De Nigris v. United States, 169 Ct. Cl. 619, 625 (1965). Accord, Liotta v. United States, supra, 174 Ct. Cl. at 96, and cases cited therein.
(b) Furthermore, the bases for the “technical breach” contention were all considered by the agency and the Civil Service Commission, and it cannot be concluded that their rejection thereof was unreasonable. These bases are as follows:
1. Plaintiff claims he did not knowingly violate any conduct rule, i.e., (a) he did not know of Roosevelt Chevrolet’s part in the sales picture, nor did he play any part in any “subterfuge” whereby the sale was made to appear as having-been made by Roosevelt instead of by Kinney Motors; (b) he did not know that the Kinney Motors 1956 income tax was being audited in his group at the time of his purchase of the *934 automobile; (c) be was not cognizant of and bad no control over tbe assignment of the Bombacks’ 1954 income tax return to bis group for audit; and (d) he did not know that tbe Bombacks’ 1956 income tax return was among those which be and bis group bad closed by survey without assignment. However, tbe contrary agency and Civil Service Commission findings, which rejected plaintiff’s contentions concerning bis alleged lack of knowledge (findings 15(a), 18) are plainly supported by substantial evidence and cannot be held to be unreasonable.[13]
2. Plaintiff furthermore claims that Section 29 of tbe agency’s Buies of Conduct is too vague and indefinite. Tbe Civil Service Commission’s conclusion that, although tbe Rule “is necessarily general in nature,” plaintiff’s “conduct [with respect to tbe automobile purchase] indicates that be was well aware of tbe Rule and its application,” (finding 18) is wholly reasonable. Tbe rejection of plaintiff’s further contention that tbe Service’s interpretation of Section 29 was unduly restrictive in that it would prevent employees of tbe Service from even patronizing in any way many taxpayers in tbe District was also justified. In tbe first place, plaintiff’s group was only one of several in the District. It did not, in any particular year, cover tbe entire District. Secondly, tbe automobile transaction in question, characterized by tbe Heingartner and Peters affidavits themselves as having been “bandied in an unusual manner” (findings 5 (a) and (b)), cannot properly be compared with a routine purchase of an article from a taxpayer located in tbe District.
3. Tbe further contention with respect to Rule 29 that the prohibition against employees having financial transactions with “taxpayers having cases pending before tbe Bureau or field offices with which such employees have an official con *935 nection” (finding 7) does not cover “the mere filing and routine checking of a taxpayer’s annual income tax return” and that “a ‘case pending’ within the meaning of that rule must encompass some element of a disputed claim or controverted issue” (plaintiff’s brief, p. 6) is not sustainable for two reasons : (a) it is plain, as plaintiff himself admitted at the trial, that in the Service’s terminology, which plaintiff well understood, any return which was to be audited was referred to as a “case” ;[14] and (b) it appears that this contention is being made for the first time in this court. Plaintiff’s failure to raise this issue administratively thus constitutes a failure to exhaust his administrative remedies and precludes its presentation here. Pine v. United States, 178 Ct. Cl. 146, 371 F. 2d 466 (1967), and cases cited therein.
4. Plaintiff contends that there is no showing that he ever received any favors or monetary benefits as a result of the incidents forming the basis of the charges, or that, in turn, he ever gave any favors or any kind of unwarranted favorable consideration to the taxpayers involved. Plowever, again the Civil Service Commission’s disposition of these contentions was reasonable. First, it pointed out plaintiff’s own admission to the [Revenue Inspectors that he “probably got a better price” on the automobile than anyone else would have received (findings 3, 18). Secondly, it held that (a) because of “the nature of the work in which appellant was engaged,” (b) the fact that “employees of the Internal Revenue Service must be held to strict accountability,” and (c) that any “compromise” of the “integrity or morality” of such employees “could lead to serious consequences and a breakdown in our tax collection structure,” the actual existence of such favors, benefits, or monetary gain was in any event irrelevant (finding 18). Cf. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 548-51 (1961). Revenue agents especially must be “above board, in all their dealings with the taxpaying public.” Liotta v. United States, supra, 174 Ct. Cl. at 97.
*936 (c) It is true tbat where the employee’s offense is, considering all tbe facts and circumstances, so minor tbat a discharge based thereon would be “unduly harsh and unwarranted” and would therefore constitute “an abuse of discretion by the agency that demands redress by this court,” the court may hold the discharge to be unlawful and award a back pay recovery. Clark v. United States, 162 Ct. Cl. 477, 484-85 (1963). However, for the reasons set forth, this case would not be an appropriate one for the application of such doctrine.
CoNCLtrsioN op Law
Upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 Finding 6.

 Neither party had, by its motion, brought the record of the administrative proceedings before the court.

 At the pretrial conference defendant objected to the holding of a trial, contending that the court’s determination of whether the agencies had acted arbitrarily, capriciously, or otherwise unlawfully, should be based only on a review of the administrative proceedings. Such objection was overruled by the commissioner, as set forth in Ms “Memorandum of Pretrial Conference” filed January 20, 1967, which memorandum also set the case down for trial. Defendant’s request for review of such action by the commissioner was, by order of the court dated February 20,1967, denied.

 Mr. Barry had executed a substantially similar affidavit on December 3, 1962.

 The three interviews referred to in findings 2, 3 and 4 were transcribed verbatim. As stated, plaintiff’s statements were made under oath. Plaintiff executed a statement at the end of the transcription to the effect that he had read the entire transcription, that it was true, complete, and voluntarily given, and plaintiff was given a copy thereof. These transcriptions of the interviews are referred to as “affidavits.”

 Specification 2 of this charge was subsequently dropped.

 In the terminology of the Service, a return that is to be examines or auditecl is a “case.”

 The charges erroneously referred to the month as April.

 Plaintiff’s briefs do not reassert tbe alleged procedural defect contention he made before the New Tort Region of the Civil Service Commission (finding 17) and the Commission’s Board of Appeals and Review (finding 19) to the effect that the failure to advise him of his right to have counsel during the three interviews with the Revenue Service Inspectors constituted an illegality. In any event, the disposition of the contention which both the Regional Office (finding 18) and the Appeals Board (finding 20) made was clearly proper.

 “It is not onr function to substitute our Judgment for that of the employing agency or the Civil Service Commission. Our review is limited to the sole question of whether their action was reasonable in the light of all the evidence.” 149 Ct. Cl. at 6.

 “The power of removal from office In the executive branch of the Federal Government, absent some specific provision to the contrary, is incident to the power of appointment. Keim v. United States, 177 U.S. 290, 293 (1900). Where an administrative agency has complied with the prescribed procedural requirements, the Court of Claims can only review the action to determine whether the officials who effected the dismissal acted arbitrarily, capriciously or were so grossly erroneous as to be in bad faith, as for instance where they may have acted without substantial evidence to support their decision or where they exceeded their authority.” 177 Ct. Cl. at 858.

 "The question is: does the record contain substantial evidence to support the administrative decision? Moon v. Celebrezze, 340 F. 2d 926, 930 (7th Cir. 1965). If it does the petition must be dismissed.” 181 Ct. Cl. at 8, 383 F. 2d at 415.

 “As to the merits of a Government employee’s dismissal, we do not review them, unless there is a showing of malicious or arbitrary action by the Government department which dismissed the employee. See Gadsden v. United States, 111 C. Cls. 487; Levy v. United States, 118 C. Cls. 106. Even if such action by the dismissing department is alleged, when the statute, here Section 14 of the Veterans’ Preference Act, provides for an appeal to the Civil Service Commission where all questions involved in the dismissal may be reviewed, we will not review the decision of the Commission except to the limited extent necessary to determine whether its decision is supported by substantial evidence, considered in the light of the entire record. See Bayly v. United States, 99 C. Cls. 598.” 128 Ct. Cl. at 291, 120 F. Supp. at 775-76.

 Plaintiff admitted at the trial that although the assignment of the returns to his group for audit was made by the Control Section, he would indicate his acceptance of the assignments by placing his initials on the returns. (Transcript, p. 45) In addition, he kept a list in his office of all the returns that were assigned to his agents. (Tr., p. 70) furthermore, after the agent in his group completed his audit, plaintiff was responsible for reviewing the audit report. (Tr., p. 46) Similarly, plaintiff was responsible for initialing (in a location on the return adjacent to the taxpayer’s name) every return closed by survey before assignment. (Tr., p. 74)

 Transcript, p. 37. Throughout his testimony, plaintiff referred to such returns as “cases.” See e.p., Tr., pp. 45, 54, 70, 101.